## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **JOHN JAMES DONOVAN** | ) | |
| **of West Paris, County of Oxford** | ) | |
| **and State of Maine,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 07-** |
| | ) | |
| | ) | |
| **BANK OF AMERICA, N.A.** | ) | |
| **a banking association  with a place** | ) | |
| **of business in Portland, County of** | ) | |
| **Cumberland and State of Maine,** | ) | |
| | ) | |
| **Defendant** | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

John James Donovan complains against the Bank of America, N.A. as follows;

## PARTIES

1.      John Donovan (hereinafter "Plaintiff" or "Donovan") is a resident of West Paris, County of Oxford and State of Maine.  He is a 100% disabled Vietnam veteran.  As of September 2005, he was operating a business named "Exotic Wood Elegance" and "Exotic Wood Products" which had a web site on the Internet.

2.      Bank of America, N.A. (hereinafter "Defendant") is a national banking association with offices in Portland, Maine.  Plaintiff had loans and accounts with Fleet Bank since approximately 2002; Bank of America purchased Fleet Bank in June, 2005 and at that time changed all loan and deposit accounts to Bank of America account numbers.  As of September 1, 2005, Plaintiff had three accounts with the Defendant – a

savings account (a/k/a "money market savings account"), a regular checking account and an interest-bearing checking account.  He also had a personal line of credit and a $5,000 overdraft account.

## JURISDICTION

3.      Jurisdiction exists over this action pursuant to 28 U.S.C. § 1331 and the provisions of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681u and in particular, 15 U.S.C. §§ 1681n and 1681o.  Jurisdiction over the state law claims exists under the principles of supplemental jurisdiction set out in 28 U.S.C. § 1367.  Venue is proper in this District since the Plaintiff resides here, the Defendant has offices here, and a substantial part of the events giving rise to the claim occurred here. See 28 U.S. C. § 1391(b).

## STATEMENT OF FACTS

4.      On September 2, 2005, Donovan deposited in his Bank of America regular checking account a check for $11,492 which check represented some of the proceeds from Plaintiff's home equity loan obtained through Option One Mortgage Corporation

5.      John Donovan received a check through a Federal Express delivery in early September of 2005 for $789,613.84 and made payable to "Exotic Wood Elegance, John J. Donovan."  See Exhibit A.

6.      The check was dated August 22, 2005 and was mailed to Donovan's address at that time "378 Park Avenue, Portland, Maine 04102," which address is also on the check.  The check was drawn on a bank named "Harris Bank Roselle" in Roselle, Illinois and appeared to be from an account owned by "Maytag."  The check (hereinafter "the Maytag check") also stated on its reverse side that it contained four "security

features:  exceeding FSA Guidelines" and that "attempts to copy or chemically alter [the] document [would] activate valuguard security features."  Upon information and belief, Harris Bank Roselle is an Illinois banking corporation and has been used in the past as part of check fraud schemes.

7.     When Plaintiff Donovan received the Maytag check, he believed that the check constituted the proceeds of some contest involving Maytag that he had won, but had questions in his mind in that regard and felt that the only way to learn if he had actually won was to see if his bank honored the check.

8.     On September 6, 2005, Donovan proceeded to endorse and deposit the check for $789.613.84 into his "Money Market Savings" account at Bank of America.

9.     On September 6, 2005 he also deposited a check for $1,670.00 into his regular checking account at Bank of America.  That check also represented proceeds from Plaintiff's Home Equity loan through Option One Mortgage Corporation.

10.     At some point before September 13, 2005, someone unknown to the Plaintiff mailed a check to the Portland, Maine branch office of Bank of America indicating that the check should be deposited to the checking account of the Plaintiff. The check (hereinafter "the Mail-In check") was in the sum of $198,200.  A deposit in that amount is reflected on Donovan's bank statement as a "counter credit" and was posted on September 13, 2005.  See Exhibit B.  That deposit was made to Plaintiff's interest checking account which the Plaintiff had opened on September 1, 2005 with a deposit of $100.  Bank of America violated its own policies in accepting this deposit which required that all deposits made within 30 days of opening an account had to be made in persons.  Bank of America should have at least obtained a deposit slip or some

other documentation signed by the depositing party, but has never provided any such document to the Plaintiff.

11.     Shortly after September 13, 2005, Plaintiff received in the mail a copy of a receipt for a deposit of $198,200 into his interest checking account.  Plaintiff was baffled as to what the deposit was and who had made it.

12.     Exhibit C hereto is a copy of the front and back of the Mail-In check deposited to Plaintiff's checking account.  The check was dated September 7, 2005 and appeared to be written off of an account at a Michigan credit union called "Great Union Family Service Centers" and stated that it is an "official check."  The check is made payable to John J. Donovan and appears to be endorsed on the back with some symbol which is not the Plaintiff's signature.  John Donovan never saw the check until the Defendant provided him a copy in May of 2007. The check reflects on its face in the "memo" section that the check was being delivered in connection with "account #004580298697" – i.e., the interest checking account that Donovan had opened just twelve days before and which had not been used by Mr. Donovan.  Upon information and belief, some person was able to access Bank of America's records to learn Plaintiff's account number.  Upon information and belief,  "Credit Union Family Service Centers" are facilities used by credit union members to cash checks or to deposit and/or withdraw funds or make loan payments.

13.     Donovan was in no way a participant in any wrongdoing in regard to either the Maytag check or the Mail-In check.

14     On September 13, 2005, Donovan cashed a check withdrawing $9,950.00 from his Money Market Savings account and wrote a check for $7,500.00 to Caroline Donovan.

15.    On September 16, 2005, Defendant debited Plaintiff's Money Market Savings account $60, subsequently noting on his bank statement for September 2005 that the fee was charged as an  "Account Research Fee, Fdes Ntn 7011196 Nbkfjw3".

16.    On or about September 17, 2005, the Plaintiff learned that the Defendant had placed four "holds" on four checks deposited into his accounts.  The holds included the check deposited on 9/2/05 for $11,492, the two checks deposited on September 6, 2005 (including the deposit of the $789,613.84 Maytag check) and the "Mail-In" deposit of $198,200 on September 13, 2005.  See Exhibit D.  These notices stated that the bank was "delaying the availability" of each check, giving dates at which the funds "will be available."  Funds from the Maytag check would be available on "9/21/05."  Funds from the Mail-In check would be available "9/28/05."

17.    On or about September 17, 2005, Mr. Donovan also received a letter from Bank of America signed by a "Janet Hunter" informing him that Bank of America "has elected to close" his three accounts – i.e., his savings, his regular checking and his interest checking.  See Exhibit E.  The letter stated that "[a] cashier's check for any collected balance, less a $60 account research fee, will be mailed to you after all previously deposited items have been verified."  The letter further stated, "at closure, we may report the account to Chex Systems and Primary Payment Systems, account verification services. This may adversely impact your ability to open an account at another financial institution for up to five years."

18.     Primary Payment System, Inc. ("PPS") was in 2005 an affiliate of First Data Corp.  PPS operated a database known as its "Early Warning Service" to assist banks, check assistance companies and credit card issuers in preventing payment and identity fraud.  Financial institutions contribute information as to their experiences with accounts to PPS to include in their databases to be made available to banks deciding whether to allow a customer to open an account.  Upon information and belief, by 2005, PPS covered an estimated 90 percent of all transaction accounts in the United States.  Banks may also expeditiously obtain PPS information as to high-risk deposits and quickly determine the legitimacy of checks so as to comply with the shortened check clearing windows that have been put in place in recent years.

19.     Upon information and belief, in 2006 Bank of America collaborated with other large financial institutions to purchase PPS and renamed it "Early Warning Services, LLC."

20.     By a notice dated September 20, 2005, Plaintiff learned that the $198,200 had been dishonored and that that amount would be charged against his checking account.  (See Exhibit F).  Plaintiff's bank statement for the period August 25, 2005 through September 23, 2005 reflects the "Return Item Charge back" on September 20, 2005 and a deduction of $198,200.  (See Exhibit B).

21.     Donovan has never received any notices like Exhibit F advising him that the $789,613.64 check had been dishonored.  In fact, he received a monthly statement showing that the check had been honored and that the funds were in his account.  See Exhibits B and G reflecting interest earned totaling $2,377.03, consisting of $812.35 earned in September 2005 and $1,564.68 earned in October, 2005.

22.     At some point before September 21, 2005, Plaintiff spoke with Jeri Armstrong, a fraud investigator working out of Bangor, Maine for Bank of America about the two checks.  Jeri asked the Plaintiff to drop off at the Portland branch certain information about the checks, including the Federal Express envelope in which the Maytag check was received.

23.     On or about September 21 or 22, 2005, Plaintiff went to the Defendant's Westgate branch in Portland, Maine to drop off information to be forwarded to Mr. Armstrong in Bangor.  On that occasion, Plaintiff spoke with the manager named "Stacey" in order to look into the status of his accounts.  At that time, Stacey got on a speakerphone with Mr. Armstrong.  Plaintiff informed Stacey and Armstrong that he had no involvement with any fraud and no involvement whatsoever with the deposit of the $198,000 check.  Stacey, nevertheless, acted in a manner suggesting that the Plaintiff was involved in wrongdoing.   During the call, Armstrong stated, in response to a question from Mrs. Donovan, that the Maytag check appeared to be "good."  Toward the end of that call, Armstrong instructed Stacey to reinstate Plaintiff's accounts.  Stacey told the Plaintiff that it would take a few days.

24.     Plaintiff followed up a few days later and could not get Stacey to respond. He was told to call Armstrong.  He tried to do so repeatedly, but over the course of weeks, Mr. Armstrong never returned his calls.

25.     As of September 27, 2005, the "hold" time stated as to the Maytag check had expired for almost a week.

26.     On September 27, 2005, Plaintiff wrote a check to Capital One for $16,689.09 to pay off an auto loan on his 2002 Nissan Xterra.  That check was

dishonored and returned the next day.  The Defendant posted the check again as a deposit on September 30, 2005 and dishonored it again on October 3, 2005.

27.     Two months after the September 20, 2005 notice that his accounts were being closed, Donovan received a bank statement for the period of 10/25/05 through 11/22/05 reflecting various transactions closing his accounts at Bank of America.  See Exhibit H.  The three accounts which the previous month had totaled $779,367.77 were now reflected as three balances of zero.  Compare Exhibits E, G and H.

28.     Donovan's November 2005 bank statement contains three separate entries advising Donovan that the funds in his three accounts had been combined on October 26, 2005 into one cashier's check that was being issued to Donovan.  The "transaction" entries for the three accounts contained the following entries:

**REGULAR CHECKING**

| 10/26/05 | $2,382.32 | **Account Closing Transaction** |
| | | **Issue Cashier's Check #9487005689** |
| | | **Fdes Ntr 7011196 Nbkks 93** |

**INTEREST CHECKING**

| 10/26/05 | $   95.33 | **Account Closing Transaction** |
| | | **Issue Cashier's Check #9487005689** |
| | | **Fdes Ntr 7011196 Nbkks 93** |

**MONEY MARKET SAVINGS**

| 10/26/05 | $ 776,890.12 | **Account Closing Transaction** |
| | | **Issue Cashier's Check #9487005689** |
| | | **Fdes Ntr 7011196 Nbkks 93** |

Included in the cashier's check that was to be issued to the Plaintiff was his monthly "VA Disability" check of $2,429 which was direct deposited on September 30, 2005.

8

29.     In 2006, Bank of America continued to treat the proceeds of the $789,613 check as being owned by the Plaintiff.  The Bank issued Donovan a 1099 for tax year 2005 of $2,377.03, noting on the 1099 that it reflected "interest income" on Donovan's "Money Market Savings."  See Exhibit I.

30.     Plaintiff attempted to obtain the promised cashier's check repeatedly. Defendant's representatives repeatedly assured him that he would be receiving his funds, providing him with various excuses as to why he had not yet received it.  He was told in December 2005 that a cashier's check was in the mail to him.  At one point in January, 2006, he was told by a Bank of America representative named Karen Borden that the cashier's check may have been lost in the mail and that he would have to wait a 90 day period before a new one was issued.  He was passed repeatedly from one Bank of America official to another.  Even as recently as April, 2007, an official in the "RISC Department" from Bank of America named "Alison" told the Plaintiff that she had the cashier's check in front of her, claiming that she was awaiting "verification" from the Plaintiff.

31.     In May of 2007, after giving Plaintiff numerous stories over the course of more than eighteen months, another person in Plaintiff's "RISC Department" informed the Plaintiff that Bank of America was not going to honor the check or give Plaintiff the promised cashier's check and that there was no check coming to the Plaintiff.  Instead, they told him for the first time that they had "found the check to be altered" and on January 10, 2006 they had re- credited the issuing bank—"Harris Bank Roselle" of Michigan for the Maytag check.  "Alison" who had told Plaintiff she was holding the check would not return any calls from the Plaintiff.

32.     Not until late May 2007 did the Defendant supply the Plaintiff with copies of the two checks.  (See Exhibits J & K).  Defendant has never returned the originals of either check.  He has received no explanation of why or when the Defendant took the sums that it took or what happened to the cashier's check.

33.     Mr. Donovan is a veteran who receives monthly payments from the Veterans Administration on which he and his wife were living.  As a result of the closing of his accounts and the reporting of Plaintiff to Chex Systems and PPS, the Plaintiff was unable to set up accounts anywhere and suffered and continues to suffer extreme stress and humiliation.

34.     The promises that the Funds were forthcoming in a cashier's check and other wrongs by the Defendant led to severe financial problems in Plaintiff's life and eventually to a foreclosure on his home and the repossession of his automobile. Defendant caused repeated bouncing of checks to Plaintiff's mortgage lender and attendant fees charged to him by Bank of America.  Defendant's conduct caused severe emotional distress and aggravated pre-existing conditions.  As a result of not being able to open an account, the Plaintiff was unable to deposit his VA checks into a personal account and instead had to cash them and pay substantial fees for doing so.

35.     Plaintiff has also suffered great loss of reputation and suffering as a result of being falsely accused of being a check fraud suspect.  Upon information and belief, on or about October 27, 2005, Defendant reported John J. Donovan to Chex Systems, stating he was being reported for "suspected fraud activity."  They reported him for three alleged frauds – one in regard to his regular checking account; one in regard to his money market savings account; and one in regard to his interest checking account.  See Exhibit L.

36.     Plaintiff was repeatedly humiliated as he was refused the simple privilege of opening an account or cashing a check at various institutions on the ground that he had been designated as a fraud suspect.

37.     The false defamatory statements by Bank of America were conveyed to Chex Systems and through them to other financial institutions, including Wachovia Bank of South Carolina on November 1, 2005 and to Norway Savings Bank on November 1, 2005 and to Tru Choice Federal Credit Union on February 1, 2006 and to TDBanknorth, Maine on August 3, 2006 and again on March 2, 2007.

38.     On or about June 7, 2006, Attorney Steven Lechner, Esquire, spoke with Defendant's fraud investigator, Jeri Armstrong.   Armstrong stated that Bank of America believed that Mr. Donovan was involved with a "Nigerian Scam" in connection with the large deposits that were made to his accounts.  His attorney wrote to Armstrong on June 7, 2006 asking for a detailed accounting of the deposits that Bank of America considered to be fraudulent and those not considered being fraudulent and "whether and when" any of the funds were returned to Mr. Donovan.

39.     Bank of America never responded to that letter.  The Bank did, however, continue to call and correspond with the Plaintiff, claiming that the Plaintiff owed money to the Bank on a line of credit.  The Defendant arbitrarily inflated the balance by over $5,000.

40.     Prior to January 17, 2007, Plaintiff protested to Chex Systems that he had been improperly reported to them.

41.     On January 17, 2007 Chex Systems responded that they would be assessing whether a "reinvestigation" was "necessary" and that in that event, it would

"contact the source of the information to request that they verify the accuracy and completeness of the information they submitted to us."  See Exhibit L.

42.     In violation of Maine law and 15 U.S.C. § 1681i (a) (1), no results of the reinvestigation were provided to the Plaintiff within twenty-one days (as required by Maine law) or even thirty days as provided by federal law.

43.     On February 14, 2007, Chex Systems wrote to Plaintiff informing him that the reinvestigation of the information in his consumer file was complete and that they could not verify the completeness and accuracy of the "disputed information submitted by Bank of America" and therefore had removed it from Donovan's consumer file.  See Exhibit M.

44.     On March 12, 2007, Chex System wrote to Plaintiff again.  They informed the Plaintiff that Bank of America had "certified that the [initial] information is accurate and complete" and for that reason had "been reinserted into your consumer file."  Chex Systems added back to Plaintiff's consumer file the defamatory statements that the Plaintiff had been engaged in "suspected fraud activity," but this time only as to the Plaintiff's regular checking account.  Chex Systems included no indication of Plaintiff's having disputed the accuracy of the statements and, upon information and belief, Bank of America submitted none.  See Exhibit N.

45.     Plaintiff again challenged Chex Systems actions in placing in his file the false information reported by Bank of America.

46.     On March 21, 2007, Chex Systems wrote to Plaintiff that it would be contacting Bank of America to request that they verify the accuracy and completeness of the information they had submitted to Chex Systems.  See Exhibit O.

47.     On March 22, 2007, Plaintiff repeatedly attempted to reach Bank of America, but was placed on hold for very lengthy periods of time or was informed that "due to technical difficulties" his call could not go through.

48.     On March 26, 2007, Plaintiff finally reached a human being at Bank of America who said his name was "Mike."  The person refused to provide his last name. Mike told the Plaintiff that Plaintiff had been reported to Chex Systems for depositing two counterfeit checks – one for $198,200 and one for $789,613.84.  Plaintiff informed Mike that he had done nothing fraudulent in regard to the checks.

49.     On March 30, 2007, Chex Systems reported to Plaintiff that its reinvestigation was complete and that the "disputed information submitted by Bank of America has been verified as accurate and complete as reported" and therefore would be retained in his file.  See Exhibit P.

50.     On April 5, 2007, Plaintiff's attorney spoke with a collection agent for Bank of America, "NCO Financial," who is seeking to collect debts claimed to owe on Plaintiff's line of credit.  Plaintiff's attorney explained the wrongful activities by Bank of America in regard to the Plaintiff's accounts and faxed that person documentation of the Bank's closing Plaintiff's accounts and consolidating his balances into what was supposed to be a cashier's check issued to Donovan.

51 .    On June 13, 2007, Chex Systems wrote to Donovan, with no indication of what prompted the letter, but enclosing a new consumer report stating that there was no "Reported Information" found of mishandling accounts or having outstanding debts.  See Exhibit Q.  Donovan was not notified of his right to have previous recipients of the report

receive an updated, corrected report and upon information and belief, no such corrected

requests were sent out.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF UCC

52.     Plaintiff incorporates by reference all other paragraphs of this complaint as

if set forth fully herein.

53.     The above conduct by the Defendant violated various provisions of

Maine's  Uniform Commercial Code, including 11 M.R.S.A. § 4-202, 4-212, 4-213 and

4-302.   After the "hold" period lapsed and Bank of America failed to dishonor the

Maytag check, the funds in Plaintiff's accounts became his property.

54.     Upon information and belief, Bank of America accepted the Maytag check

and presented it successfully for collection to the drawee bank, Harris Bank.

55.     Upon information and belief, Harris Bank did not timely dishonor the

Maytag check and failed to exercise "ordinary care" as required by section 4-202 of Title

11.  Since the settlement for the item became final, Bank of America had no right to

"revoke, charge back or obtain a refund" from Donovan, see 11 M.R.S.A. § 4-212(1), and

became "accountable" to Donovan "for the amount of the item and any provisional credit

given for the item in an account of the customer becomes final."   11 M.R.S.A. § 4-

213(3).

56.     Bank of America repeatedly informed the Plaintiff that the Maytag check

had been honored by the drawee bank.  Bank of America credited Plaintiff's account

accordingly.

57.     Bank of America has never provided Plaintiff any notice that the Bank

intended to provide Plaintiff's funds to Harris Bank or why it would do so.  In May 2007,

14

a representative <u>told</u> the Plaintiff for the first time that Bank of America had paid Harris Bank on January 10, 2006.

58.     Although Donovan was an "endorser" of the check, Plaintiff had no endorser liability to the Defendant which would justify the Bank's taking his funds or paying those funds to a third party such as Harris Bank.

59.     In order to impose liability upon Donovan as an "endorser," Bank of America would have been obligated to allege and prove in a lawsuit that the Maytag check was dishonored; that there had been a "presentment" and that Bank of America had provided Donovan "notice of dishonor" and protest.  11 M.R.S.A. § 3-1415(a).  It did none of these things.  It brought no action to establish any basis to take money from the Plaintiff and provided no notice of dishonor.

60.     When the instrument being dishonored is a check, the failure to make a timely presentment and provide a timely notice of dishonor operates to discharge the endorser. (11 M.R.S.A. § 3-1503(1)).

61.     The notice of dishonor of an instrument must be provided within specific time limits of dishonor as set out in Article 3 of the UCC.

62.     In cases of bank collection, an instrument is considered "dishonored" when it is "seasonably returned by the midnight deadline."  11 M.R.S.A. § 4-1301(3) (check is dishonored when the bank receives it back as having been dishonored).  <u>See also</u> § 3-1508(3) (made applicable to Article 4 by 4-1104(3)).

63.     Nor was Bank of America entitled to revoke the settlement with Donovan under 11 M.R.S.A. § 4-212 or otherwise "obtain refund" from Donovan under that section since it did not return the item or send notification of the facts within a reasonable

15

time after the midnight deadline.  Since it did not send such a notice, it is liable for all

losses resulting from the delay provided in section 4-212(1).

64.     Plaintiff was damaged as a result of these statutory violations of Maine

law.

**SECOND CLAIM FOR RELIEF**
**NEGLIGENCE**

65.     Plaintiff incorporates by reference all other paragraphs of this complaint as

if set forth fully herein.

66.     The Defendant had a duty to exercise reasonable care in its dealings with

the Plaintiff and his accounts and in determining promptly the legitimacy of the checks

presented for deposit and a duty to inform the depositor accurately as to the status of the

deposits.

67.     The Defendant owed the Plaintiff a duty of care both in handling his

accounts and in reporting any information about his accounts or his financial activities to

third parties.  The duties arising from state and federal statutes and from common law

including the duty to protect his financial information and account numbers, guard

against and properly respond to evidence of identity fraud or misuse of customer

accounts by others, communicate accurately and promptly to the Plaintiff as to the status

of items deposited and funds being available to the depositor and the duty to avoid

reporting false information about customers to third parties.

68.     Defendant failed to exercise ordinary care in performing its duties and has

been negligent and reckless in its dealings with the Plaintiff and his accounts.  The

Defendant breached its duties by, *inter alia*: (A) failing to utilize properly the advanced

services available to promptly determine the legitimacy of checks presented to it such as the Mail-In check and the Maytag check;  (B) failing to promptly advise the Plaintiff as to the legitimacy of the Maytag check; and (C) allowing Plaintiff's personal financial information to become available to perpetrators of fraud; (D) accepting for deposit the Mail-In deposit without requiring an in-person deposit as provided in the Bank's own policies; (E) depositing the Mail-In deposit into Plaintiff's account without consulting him and without determining who was placing those funds in his account; (F) failing to properly investigate the Maytag check; (G)  informing the Plaintiff that the Maytag check was "good" and that the proceeds would be or had been sent to him; and (H) failing to determine that the Plaintiff had no involvement in any check fraud.

69.     Defendant knew, or should have known, that the Plaintiff would suffer injury as a result of the various failures to exercise due care as described above.

70.     Due to Defendant's negligence, Plaintiff suffered and continues to suffer monetary losses and has suffered from, and continues to suffer, great emotional distress.

### THIRD CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CHATTELS

71.     Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

72.     The actions of the Defendant as set out above constitutes the wrongful interference with chattels.

73.     As a direct and proximate result of the Defendant's wrongful conduct as aforesaid, the Plaintiff has suffered substantial damages.

74.    As a consequence of its wrongful conduct, the Defendant is liable to the Plaintiff in the amount to fully compensate Plaintiff for his injuries, as well as interest and costs.

**FOURTH CLAIM FOR RELIEF**
**RECKLESS OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

75.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

76.    The foregoing actions undertaken by the Defendant were reckless and/or intentional, and the Defendant knew or should have known that a likely result of its conduct would be to inflict severe emotional distress upon the Plaintiff.  The actions were extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

77.    As a direct and proximate result of the Defendant's wrongful infliction of emotional distress, the Plaintiff has suffered emotional distress so severe that no reasonable person could be expected to endure it.

78.    As a consequence of this wrongful conduct, the Defendant is liable to the Plaintiff in an amount to be determined, together with punitive damages, interest and costs.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

79.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

80.    The Defendant undertook a special relationship with the Plaintiff and as a result owed the Plaintiff a duty of care to avoid inflicting emotional harm on him.

81.     Defendant breached the duties owed to the Plaintiff, and it was reasonably foreseeable that the above-described actions by the Defendants would result in emotional distress to the Plaintiff.  Defendant's breaches did proximately cause harm to the Plaintiff.

82.     As a consequence of their wrongful conduct, the Defendant is liable to the Plaintiff in an amount to fairly compensate the Plaintiff, together with interest and costs.

<u>SIXTH CLAIM FOR RELIEF</u>
<u>MISREPRESENTATION</u>

83.     Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

84.     Defendant falsely represented to the Plaintiff that the Maytag check had been honored and that the Bank had issued him a cashier's check for $779,367.77.

85.     The Defendant had a duty to disclose the truth to the Plaintiff as to the status of his account and his deposits and failed to advise him as to the dealings with Harris Bank. ("Omissions")

86.     The false statements and misleading Omissions by the Defendant are referred to hereinafter as the "False Representations."

87.     Defendant knew that the False Representations were false or acted in reckless disregard as to the truth or falsity of the False Representations.

88.     The False Representations were made for the purpose of misleading the Plaintiff or concealing the actions of the Defendant.

89.     Alternatively, the False Representations were supplied for the guidance of Donovan in his business affairs, and Defendant failed to exercise reasonable care or

competence in obtaining or communicating information in regard to the Maytag check and the cashier's check and its dealings with Harris Bank resulting in pecuniary loss to the Plaintiff who justifiably ruled upon the False Information.

90. As a proximate result of the False Representations, the Defendant obtained Plaintiff's funds, and misled Plaintiff as to his financial affairs, including as to what funds he would have available in the future for his creditors.

91. As a proximate result of the misrepresentation, Plaintiff suffered damages. Defendant is liable to Plaintiff for compensatory damages in an amount to be proved at trial, together with interest, and costs.

## SEVENTH CLAIM FOR RELIEF
## CONVERSION

92. Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

93. Plaintiff had a property interest in the sums deposited into his accounts.

94. Plaintiff had the right to possession and control of his accounts and the balances therein at the time that the Defendant removed those funds, or caused them to be removed, or transferred them elsewhere all without Plaintiff's authorization.

95. Defendant took the Plaintiff's property wrongfully and maliciously.

96. Plaintiff suffered damages in the manner described above and in an amount to be proved at trial, together with punitive damages, interest, and costs.

## EIGHTH CLAIM FOR RELIEF
## PUNITIVE DAMAGES

97. Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

98.     In respect to each state law count in the Complaint, Defendant's conduct was deliberate and motivated by ill will toward the Plaintiff or was so reckless and outrageous that malice toward the Plaintiff is implied.

99.     As a consequence of its wrongful conduct, Defendant is liable to Plaintiff for punitive damages in a sufficient amount to punish Defendant and to deter Defendant and others from such conduct in the future, plus interest, and costs.

### NINTH CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTIES

100.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

101.    The Defendant undertook a special and fiduciary relationship with the Plaintiff, and as a result owed the Plaintiff a fiduciary duty of utmost care and full and complete disclosure.

102.    Defendant breached its duties and caused harm to the Plaintiff.

103.    As a consequence of its wrongful conduct, the Defendant is liable to the Plaintiff in an amount to fairly compensate the Plaintiff, together with interest and costs.

### TENTH CLAIM FOR RELIEF
### FAIR CREDIT REPORTING ACT VIOLATIONS
### 15 M.R.S.A. § 1681s-2(b) – Furnisher's Duties Upon Notice of Dispute

104.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

105.    The FCRA, 15 U.S.C.§ 1681-1681u, imposes duties upon consumer reporting agencies and those who furnish information to consumer reporting agencies or use information obtained from a consumer reporting agency.  One duty is to provide

accurate information; the furnisher is forbidden from supplying any information that it knows or has reasonable cause to believe is inaccurate.

106.    Chex Systems, Inc. ("Chex Systems") and PPS are consumer reporting agencies.

107.    Plaintiff is a "consumer" within the meaning of that term in 15 U.S.C. § 1681a(c).

108.    Bank of America furnished information regarding the Plaintiff to one or more consumer reporting agencies (including Chex Systems and PPS) and is a "furnisher of information" as defined in section 623 of the FCRA, 15 U.S.C. § 1681s-2.  Bank of America is a "person" that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about its transactions or experience with consumers.

109.    When Bank of America furnished the information relating to the Plaintiff to the  consumer reporting agencies, it had reasonable cause to believe that the information was inaccurate.

110.    A bank has reasonable cause to believe information is inaccurate when it has specific knowledge, apart from allegations by the consumer that would cause a reasonable person to have substantial doubt about the accuracy of the information.

111.    Upon information and belief, Bank of America knew that the information that it was furnishing Chex Systems and others about the Plaintiff being involved in fraudulent check activity was not complete and accurate.

112.    Upon information and belief, within five days of its obtaining a notice of dispute from Mr. Donovan, Chex Systems, in accordance with 15 U.S.C. § 1681i(a)(2),

provided to Bank of America a notice that Mr. Donovan was disputing all the information in the report about his involvement in check fraud.

113.    Federal law required Bank of America, after receiving the notice of dispute, to conduct its own reinvestigation of the accuracy and completeness of the disputed information as provided by 15 U.S.C. § 1681s-2(b).

114.    Bank of America was required by federal law to report the results of its investigation so that the reporting agency could complete its reinvestigation in timely fashion.  Check Systems was required to complete its reinvestigation within 21 days under Maine law which effectively shortened the general 30 day period provided for in 15 U.S.C. § 1681i(a)(1)(A).

115.    If the completeness or accuracy of any information furnished to a credit reporting agency is disputed by a consumer, the information being provided must be noted as being disputed by the consumer in the report to the agency.  This is required even if the consumer's dispute is not made in writing.

116.    Plaintiff informed the Defendant on numerous occasions that he disputed that he was involved in any fraud as to any of the checks.  Nevertheless, Bank of America furnished that information to Chex Systems and PPS without noting that the information was disputed by the Plaintiff.

117.    Upon information and belief, Defendant received notice pursuant to section 1681i(a)(2) of Title 15 of the United States Code with regard to the challenge as to the completeness or accuracy of the information provided by Bank of America about Mr. Donovan.

118.    Even after receiving notice of this dispute as to the accuracy and completeness, Bank of America violated Section 1681s-2(b) of Title 15 of the U.S.C. by:

a)      failing to timely conduct a real investigation with respect to the disputed information;

b)      failing to timely review all relevant information;

c)      failing to timely report the results of any investigation;

d)      failing to conclude and promptly report that the information was inaccurate or incomplete or could not be verified;

e)      failing to cause the false information to be deleted, modified or permanently blocked from further reporting;

f)      failing to report to other consumer reporting agencies that the prior information was incomplete or inaccurate.

119.    Bank of America acts and practices alleged herein constitute violations of Section 623(a)(2) of the FCRA, 15 U.S.C. § 1681s-2(b) and entitled Plaintiff to actual damages, statutory sanctions per violation of the Act together with costs and attorneys' fees.

120.     After receiving notice that Donovan disputed the fraud charges in the credit report, Defendant failed to conduct a good faith reasonable investigation with respect to the disputed information and thereby violated 15 U.S.C. § 1681s-2(b). Defendant knew, or should have known, at the time of the "investigation" (and in fact for many months before) that the information that it furnished about the Plaintiff was not complete and accurate.  The information was challenged directly with several Bank of America officials, including with Bank of America's "RISC investigator" who knew, or

should have known, that Plaintiff had no knowing involvement in any fraudulent activities in relation to his accounts at Bank of America.

121.    Upon information and belief, a reasonable and careful investigation of Bank of America's records would have led to the conclusion that the fraud charges being leveled against the Plaintiff could not be verified.

122.    It would be reasonable to conclude that Bank of America did not conduct a careful and reasonable investigation in view of the following facts, inter alia:

a)    Bank of America never had any evidence that Donovan was a willing participant in any scam;

b)    Mr. Donovan was very cooperative with Bank of America's investigator from the outset;

c)    Donovan's actions in openly inquiring as to whether the Maytag check was good suggested no involvement in wrongdoing;

d)    Bank of America stated in writing that it merely was placing a hold on the Maytag check and that the funds would be available to Mr. Donovan after 9/28/05, never sending any other writing to Donovan about that check;

e)    Bank of America's investigator told Donovan that the check appeared to be good;

f)    Bank of America itself treated the check as being good for months and never advised Donovan to the contrary until May, 2007;

g) Bank of America had no reason to believe that Donovan had any involvement in depositing the Mail-in check;

h) Bank of America sent a bank statement to Donovan identifying by number the cashier's check containing the Maytag check proceeds it said it was forwarding to the Plaintiff;

i) Several of Bank of America's employees confirmed that such a check was being sent to Donovan, including one employee ("Alison") who said she had the check in her hands simply waiting for "verification";

j) Bank of America provided only untimely and convoluted and inconsistent responses to Chex Systems' inquiries about their "investigation."

k) Bank of American simply withdrew the information from the Consumer Report after twice claiming that its "reinvestigation" corroborated its claim of fraud; and

l) Bank of American inexplicably misled the Plaintiff as to what was happening in regard to proceeds of his accounts while knowing for over fifteen months that Bank of America had sent those funds to Harris Bank.

123. Furnishers under the FCRA that negligently fail to comply with any of the reinvestigation requirements are liable for actual damages, the costs of litigation and attorneys' fees.  Willful violations subject the furnishers to actual damages, plus punitive

damages, costs and attorneys' fees.  Bank of America is sued herein for both its negligent violations and its willful violations.

124.    It would be reasonable to conclude that Bank of America's violations of the FCRA were willful in view of the following facts:

a) Bank of America never had any evidence that Donovan was a willing participant in any scam;

b) Mr. Donovan was very cooperative with Bank of America's investigator from the outset;

c) Donovan's actions in openly inquiring as to whether the Maytag check was good suggested no involvement in wrongdoing;

d) Bank of America stated in writing that it merely was placing a hold on the Maytag check and that the funds would be available to Mr. Donovan after 9/28/05, never sending any other writing to Donovan about that check;

e)  Bank of America's investigator told Donovan that the check appeared to be good;

f) Bank of America itself treated the check as being good for months and never advised Donovan to the contrary until May, 2007;

g) Bank of America had no reason to believe that Donovan had any involvement in depositing the Mail-in check;

h) Bank of America sent a bank statement to Donovan identifying by number the cashier's check containing the Maytag check proceeds it said it was forwarding to the Plaintiff;

i)   Several of Bank of America's employees confirmed that such a check was being sent to Donovan, including one employee ("Alison") who said she had the check in her hands simply waiting for "verification";

j)   Bank of America provided only untimely and convoluted and inconsistent responses to Chex Systems' inquiries about their "investigation."

k)   Bank of America simply withdrew the information from the Consumer Report after twice claiming that its "reinvestigation" corroborated its claim of fraud; and

l)   Bank of America inexplicably misled the Plaintiff as to what was happening in regard to proceeds of his accounts while knowing for over fifteen months that Bank of America had sent those funds to Harris Bank.

125.   Bank of America is liable for statutory and punitive damages because it acted willfully in violation of 15 U.S.C. § 1681n.  Bank of America's failure to comply was willful in that it knowingly and intentionally committed the above acts in conscious disregard of the rights of others.

126.   Defendant's violations of the FCRA have caused severe injuries to the Plaintiff, including severe distress, humiliation, loss of reputation and pecuniary losses. Upon information and belief, Bank of America reported the results of its two "reinvestigations" confirming the false charges to Primary Systems (now known as FirstData Corp.) and may have reported the results to others.  Federal law requires those furnishing information to report the results of reinvestigations to every nationwide consumer reporting agency to which the original information being disputed was reported

and to do so within the same deadline that exists to report to the consumer reporting agency.  See 15 U.S.C. § 1681s-2(b)(1)(D).

127.    Upon information and belief, no correction notices were sent to any of the users who had obtained the false information about the Plaintiff.

## ELEVENTH CLAIM FOR RELIEF
## WRONGFUL DISHONOR

128.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

129.    The Defendant wrongfully dishonored checks properly written by Plaintiff on his account.

130.    The Defendant is liable for the sums wrongfully dishonored and all consequential damages, including humiliation and embarrassment and emotional distress.

## TWELTH CLAIM FOR RELIEF
## DEFAMATION

131.    Plaintiff incorporates by reference all other paragraphs of this complaint as if set forth fully herein.

132.    The above-described conduct in advising third parties that Donovan engaged in check fraud in relation to two checking accounts and one money market account while he was a Bank of America customer constitutes slander and libel and was unprivileged.

133.    This defamation claim is not preempted by either section 1681(h)(e) or section 1681t(b)(1)(F) of Title 15 since:

    a)      the claim is based on defamation preceding the commencement
            of the reinvestigation process under 15 U.S.C. § 1681s-2;

b)       in any event, the information was furnished with malice or a

willful intent to injure the consumer, Mr. Donovan and

c)       Section 1681t(b)(1)(F) only applies to preempt certain state

statutes, not common law principles (i.e., it references only

"the laws of any State").

134.    The Plaintiff has suffered humiliation and serious emotional distress as a

result of the Defendant's conduct.

135.    The aforesaid statements made by the Defendant were and are false and

defamatory.  Upon information and belief, Defendant made these statements in reckless

disregard as to whether they would injure the Plaintiff.

136.    These false accusations of crimes are sufficiently reprehensible or

outrageous that malice can be implied.  Defendants deliberate, malicious and outrageous

conduct entitles Plaintiff to recover punitive damages.

137.    As a direct and proximate result of the Defendant's wrongful conduct as

aforesaid, including the conveying of this false information to third parties, the Plaintiff

has suffered substantial damages.  Furthermore, the remarks are defamatory *per se* in that

they accuse Plaintiff of a crime and damages are therefore to be presumed.

138.    As a consequence of the wrongful conduct, the Defendant should be found

liable to the Plaintiff in an amount to fully compensate him for his injuries, together with

punitive damages, interest, costs and, if appropriate, attorneys' fees.

### THIRTEENTH CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH EXPECTANCY

139.    Plaintiff incorporates by reference all other paragraphs of this complaint as

if set forth fully herein.

140.    Defendant's conduct as set out herein constitutes the tortious interference with an economic expectancy – including an expectancy of the funds after they cleared and an expectancy of credit availability and the ability to open bank accounts, cash checks and conduct business activities.

141.    The interference was carried out by Defendant intentionally and through fraud or intimidation and caused substantial damage to the Plaintiff.

142.    With respect to the furnishing of false information to others, that conduct was done with malice or intent to injure as defined under 15 U.S.C. § 1681h(e).

**WHEREFORE**, Plaintiff prays for declaratory and injunctive relief, compensatory and punitive damages and attorneys' fees, pre and post-judgment interest, costs and such other relief, as the Court deems appropriate.

Dated at Portland, Maine, this 20th day of September, 2007.

/s/ John S. Campbell
_____
John S. Campbell – Bar No. 2300
Attorney for Plaintiff

CAMPBELL & ASSOCIATES, P.A.
75 Market Street – P.O. Box 369
Portland, ME  04112
(207) 775-2330

## JURY DEMAND

Plaintiff hereby demands a jury as to all counts of this Complaint.

/s/ John S. Campbell
_____
John S. Campbell – Bar No. 2300
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

I hereby certify that on September 20, 2007, I electronically filed Plaintiff's

Complaint using the CM/ECF system which will send notification of such filing(s) to the

following:

Dated at Portland, Maine, this 20th day of September, 2007.

<u>/s/ John S. Campbell – Bar No. 2300</u>
Attorney for the Plaintiffs

CAMPBELL & ASSOCIATES, P.A.
75 Market St. – P.O. Box 369
Portland, ME  04112
(207)  775-2330
campbellassoc@maine.rr.com