## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN JAMES DONOVAN, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 07-168-P-H |
| | ) | |
| BANK OF AMERICA, | ) | |
| | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

The issues in this case arise out of unusual bank account activity. In the course of about forty days, the plaintiff, who had a previous checking account balance of $1,067.73, deposited a check for $59,110 that was dishonored and a second check for $98,000 that was dishonored; opened two new accounts and deposited into one account a check for $789,613 after first asking the teller if the check was legitimate; had a check for $198,200 arrive by mail to the other account from an unknown source; and had in hand still another check for $88,000 that he did not bother to deposit but gave to a bank investigator. The $789,613 check turned out to be altered, and the $198,200 check turned out to be counterfeit. The Bank reported "suspected fraud activity" to the credit reporting agency, closed the accounts, and halted payment on all the checks. The plaintiff says that he is innocent of all fraud and is a victim of others' fraud. He has sued the Bank for damages under the UCC, common law, and the federal Fair

Credit Reporting Act.  The Bank has counterclaimed for the amount by which the plaintiff overdrew his accounts.  The parties have filed cross-motions for summary judgment.  I grant summary judgment to the Bank and deny it to the plaintiff.

## I. Facts

### (A) Undisputed Facts

In March 2004, the plaintiff, John Donovan ("Donovan") opened a regular checking account at Fleet Bank.[1]  (Fleet Bank later merged into the defendant Bank of America, N.A. ("Bank of America" or "the Bank")).[2]  On August 4, 2005, Donovan had a $1,067.73 balance in his checking account.[3]  On August 5, Donovan deposited a $59,110 check into this account.[4]  He received the check in the mail from a man in Canada, named David Williams.  Williams had informed Donovan by email that he wanted to buy several pieces of handmade wood furniture that Donovan made at his home and advertised for sale on the Internet.[5]  On August 12 the check was dishonored and returned to Bank of America as counterfeit.[6]  The Bank debited Donovan's account by $59,110.[7]  Around August

---

[1] Def.'s Statement of Material Facts ("SMF") ¶ 12 (Docket Item 23); Pl.'s Opposing Statement of Material Facts ("Opposing SMF") ¶ 12 (Docket Item 37).

[2] Def.'s SMF ¶ 14; Pl.'s Opposing SMF ¶ 14.

[3] Def.'s SMF ¶ 34; Pl.'s Opposing SMF ¶ 34.

[4] Def.'s SMF ¶ 16; Pl.'s Opposing SMF ¶ 16.

[5] Def.'s SMF ¶ 17; Pl.'s Opposing SMF ¶ 17.  Donovan never sent any product to Williams.  Def.'s SMF ¶ 19; Pl.'s Opposing SMF ¶ 19.

[6] Def.'s SMF ¶ 20.  Donovan's response is: "Qualified.  The cited testimony does not establish that the check was in fact counterfeit.  There is no designated expert testimony on that issue and none cited in the citations to this allegation.  Witness Danita Graham was never designated as a witness at all—much less as an expert witness.  Any of her testimony or any document premised on her authentication should be disregarded due to those discovery violations."  Pl.'s Opposing SMF ¶ 20 (emphasis in original).  Without deciding whether the Bank violated any discovery rules, I accept Donovan's position that there is no evidence establishing that the check was in fact counterfeit. The reasonable reading of his "Qualified" response is that, aside from this reservation, he otherwise admits that the check was returned to the Bank as counterfeit.

14, Donovan received notice from the Bank that the $59,110 check had been dishonored as a counterfeit item.[8]  Around this same time, David Williams told Donovan that he had stopped payment on the $59,110 check and was sending a replacement check for a greater amount.[9]

Donovan subsequently received a $98,000 check that he believed was Williams' replacement check, although it did not have Williams' name on it, and it was drawn on a different bank.[10]  At the same time, Donovan received an $88,000 check, which he believed was also from Williams.[11]  Both of these checks ($98,000 and $88,000) were made out to John J. Donovan, signed on behalf of Drechel, Inc., and drawn on a bank in Ontario, Canada.[12]  On August 15, Donovan deposited the $98,000 check in his regular checking account.[13]  Donovan never deposited the $88,000 check.[14]  On August 24, the $98,000 check was dishonored and returned to the Bank as an altered item.[15]  The Bank debited Donovan's

---

[7] Def.'s SMF ¶ 21; Pl.'s Opposing SMF ¶ 21.
[8] Id.
[9] Def.'s SMF ¶ 22; Pl.'s Opposing SMF ¶ 22.
[10] Def.'s SMF ¶¶ 24-26; Pl.'s Opposing SMF ¶¶ 24-26.
[11] Def.'s SMF ¶ 27; Pl.'s Opposing SMF ¶ 27.
[12] Def.'s SMF ¶¶ 24, 27; Pl.'s Opposing SMF ¶¶ 24, 27.
[13] Def.'s SMF ¶ 29; Pl.'s Opposing SMF ¶ 29.
[14] Def.'s SMF ¶ 28; Pl.'s Opposing SMF ¶ 28.  Sometime in September, he gave it to a Bank investigator.  Pl.'s Opposing SMF ¶ 28.
[15] Def.'s SMF ¶ 32.  Donovan's response is: "Qualified.  The cited testimony does not establish that the check was in fact altered.  There is no designated expert testimony on that issue and none cited in the citations to this allegation.  Witness Danita Graham was never designated as a witness at all—much less as an expert witness.  Any of her testimony or any document premised on her authentication should be disregarded due to those discovery violations."  Pl.'s Opposing SMF ¶ 32 (emphasis in original). Without deciding whether the Bank violated any discovery rules, I accept Donovan's position that there is no evidence establishing that the check was in fact altered.  The the reasonable reading of his "Qualified" response is that, aside from this reservation, he otherwise admits that the check was returned to the Bank as altered.

account by $98,000.[16]   By letter dated August 24, 2005, the Bank notified Donovan that the $98,000 check was returned as an altered check and that the proceeds were debited from his account.[17]

Because Donovan had made several withdrawals after depositing the $59,110 and $98,000 checks, his checking account was overdrawn by about $17,000 after the debits.[18]   In order to return his account to a positive balance, Donovan refinanced his house and deposited the mortgage proceeds into his regular checking account.[19]

Then, on September 1, 2005, Donovan opened two new accounts at the Bank: a money market account and an interest savings account.[20]   When he opened the new accounts, Donovan signed signature cards for each account and received a Bank of America document entitled Deposit Agreement and Disclosures.[21]

On September 6, Donovan received a $789,613 check drawn by Maytag on the Harris Bank ("Maytag check").[22]   He believed that the check represented the proceeds of an online lottery or contest that he did not remember entering but had

---

[16] Def.'s SMF ¶ 32; Pl.'s Opposing SMF ¶ 32.

[17] Def.'s SMF ¶ 33; Pl.'s Opposing SMF ¶ 33.

[18] Def.'s SMF ¶ 35; Pl.'s Opposing SMF ¶ 35.   Donovan says that the "Bank's own actions contributed to the overdraft."   Essentially, he argues that the Bank is partially responsible for the overdraft because it permitted him to make the withdrawals.   This statement does not contradict the Bank's statement that after depositing the two checks, Donovan withdrew money from the accounts, and an overdraft resulted.

[19] Def.'s SMF ¶ 40; Pl.'s Opposing SMF ¶ 40.

[20] Def.'s SMF ¶ 41; Pl.'s Opposing SMF ¶ 41.

[21] Def.'s SMF ¶ 42; Pl.'s Opposing SMF ¶ 42.   The parties disagree about which Bank of America deposit agreement Donovan received—one dated October 1, 2004 or one dated June 17, 2005.   As discussed *infra*, this dispute is immaterial to my resolution of the case.

[22] Def.'s SMF ¶ 47; Pl.'s Opposing SMF ¶ 47.   The Bank alleges that "Maytag" refers to the washing
*(continued on next page)*

received notice in late August that he had won.[23] Later that day, he deposited the check in his money market account, after first asking the bank teller whether she thought it was legitimate; she replied that she did.[24] When the funds became available for withdrawal on September 13, Donovan began writing checks drawn on the money market account.[25]

Finally, on September 13, the Bank received a mail-in deposit of a $198,200 check. The check was made out to John J. Donovan, and Donovan's interest savings account number was typed on the check.[26] This account had not been used since Donovan opened it on September 1.[27] On September 20, the $198,200 check was dishonored and returned as counterfeit.[28] The Bank notified Donovan that the check was returned unpaid.[29]

On September 7, the Bank's Risk Identification Support Center ("RISC") began investigating the Maytag check. On September 14, RISC began investigating the $198,200 mail-in deposit.[30] As a result of these investigations, by September 14, the Bank confirmed that the Maytag check and the $198,200 mail-in deposit were both fraudulent items. The payee on the Maytag check had

---

machine company. Donovan says that the cited testimony does not establish this fact. Again, this disagreement is immaterial.

[23] Def.'s SMF ¶ 48; Pl.'s Opposing SMF ¶ 48.

[24] Def.'s SMF ¶ 52; Pl.'s Opposing SMF ¶ 52; Pl.'s Statement of Additional Material Facts ("SAMF") ¶ 58 (Docket Item 37); Def.'s Reply to Pl.'s SAMF ¶ 58 (Docket Item 51).

[25] Def.'s SMF ¶¶ 55-57; Pl.'s Opposing SMF ¶¶ 55-57.

[26] Def.'s SMF ¶ 58; Pl.'s Opposing SMF ¶ 58.

[27] Def.'s SMF ¶ 60; Pl.'s Opposing SMF ¶ 60.

[28] Def.'s SMF ¶ 64. Donovan's response is "Qualified" because he says that the notices that he received did not reveal that the check was counterfeit. Pl.'s Opposing SMF ¶ 64. This qualification does not contradict the Bank's assertion that the check was returned as counterfeit.

[29] Id.

[30] Def.'s SMF ¶ 67; Pl.'s Opposing SMF ¶ 67.

been fraudulently altered, and the $198,200 check was counterfeit.[31]  The Bank placed extended holds on the two deposits and froze all three of Donovan's accounts (permitting deposits to but not withdrawals from the accounts).[32]  On September 16, it sent a letter to Donovan notifying him of the holds.[33]  The notice that Donovan received indicated that the funds from the Maytag check would be available on September 21, and the funds from the $198,200 mail-in deposit would be available on September 28.[34]

A separate letter dated September 16, 2005, informed Donovan that the Bank had elected to close his three accounts.[35]  The letter said, "A Cashier's check for any collected balance, less a $60 account research fee, will be mailed to you after all previously deposited items have been verified."[36]  On October 26, 2005, the Bank closed Donovan's accounts, and collected the proceeds in a cashier's check for $779,367.77.[37]  On October 27, the Bank reported the account closures

---

[31] Def.'s SMF ¶ 68; Pl.'s Opposing SMF ¶ 68.

[32] Def.'s SMF ¶ 70; Pl.'s Opposing SMF ¶ 70.

[33] Def.'s SMF ¶ 71; Pl.'s Opposing SMF ¶ 71.  Donovan states that he did not learn of the holds until September 17, 2005.  Pl.'s Opposing SMF ¶ 70.

[34] Def.'s SMF ¶ 71; Pl.'s Opposing SMF ¶ 71.

[35] Def.'s SMF ¶ 80; Def.'s Reply to Pl.'s SAMF ¶ 80.

[36] Account closure letter (Ex. G to Donovan Aff. of May 1, 2008 (Docket Item 28-8)).  The plaintiff's statement of additional material facts quotes this portion of the letter.  See Pl.'s SAMF ¶ 81; Def.'s Reply to Pl.'s SAMF ¶ 81.

[37] Def.'s SMF ¶ 72; Pl.'s Opposing SMF ¶ 72.  The Bank says that it prepared the cashier's check to account administratively for the proceeds of Donovan's accounts while the Bank resolved whether to honor Harris Bank's claim on the Maytag check.  Donovan's response is ambiguous, but it seems to raise two separate issues: first, why the Bank prepared the check, and second, what the Bank *told* Donovan about it.  As to the first, Donovan refers to testimony about later exchanges among Bank employees.  See Dep. of Judy Coffin, 60:8-14, March 25, 2008 (Attachment 14 to Evidentiary Submission in Support of Def.'s SMF (Docket Item 23-56)) (indicating that in December 2005 the Bank's Compliance Department may have been holding the cashier's check while awaiting some unidentified documentation from Donovan, which would permit the department to release the check to him); Dep. of Brenda Johnson, 21:6-19, 25:17-27:12,  April 10, 2008 (Attachment 10 to Evidentiary Submission in Support of Def.'s SMF (Docket Item 23-57)) (reviewing materials documenting internal exchanges among Bank employees).  But these later internal

*(continued on next page)*

to ChexSystems, Inc. ("ChexSystems"), as "suspected fraud activity."[38] ChexSystems is a consumer reporting agency.[39]

Harris Bank had initially paid Bank of America on the Maytag check on September 9, but on September 14, Harris Bank determined that the payee listed on the check had been altered.[40] Around October 3, it made a claim against Bank of America for return of its September 9 payment.[41] On January 10, 2006, Bank of America paid Harris Bank the amount of the altered Maytag check, $789,613.[42] The Bank used the balances that it had removed from Donovan's three accounts in October 2005, totaling $779,367.77, to reimburse itself partially.[43]

---

statements do not contradict the Bank's stated reason for preparing the check in October 2005—to account administratively for the proceeds of Donovan's accounts. The testimony reflects the Bank's process for properly allocating the funds after it received Harris Bank's claim. As to the second, what the Bank *told* Donovan about the cashier's check, the only evidence Donovan cites does not support his statement that he was told that "the combined funds would be forwarded." The account closure letter quoted in text speaks for itself—Donovan would receive a cashier's check for any balance remaining after all previously deposited items were verified. Here, there was no amount remaining after the Bank verified that the check had been altered and reimbursed Harris Bank accordingly. Donovan also points to a 2005 tax form 1099 that the Bank sent him in 2006, which showed $2,377.03 of interest earned in his money market account in 2005. See Form 1099 (Ex. J to Donovan Aff. of May 1, 2008, ¶ 20 (Docket Item 28-11)). Because the Maytag check was credited to Donovan's account for approximately seven weeks in 2005 (from early September, when Donovan deposited the check, until late October, when the Bank closed his accounts and debited the funds), a tax form reflecting interest earned during this period is unsurprising.

Although Donovan did not cite the statements here, I recognize that, elsewhere, he states that in December 2005 and January 2006 two Bank employees told him that a cashier's check had been mailed to him. See Pl.'s SAMF ¶¶ 127-128. Like the internal Bank statements discussed above, these statements by Bank personnel to Donovan do not contradict the Bank's stated purpose for preparing the cashier's check in October. In any event, any dispute about the Bank's intended purpose for the cashier's check is not material to my resolution of this case.

[38] Def.'s SMF ¶ 77; Pl.'s Opposing SMF ¶ 77.
[39] Pl.'s Opposing SMF ¶ 78.
[40] Def.'s SMF ¶ 54; Pl.'s Opposing SMF ¶ 54.
[41] Def.'s SMF ¶ 73; Pl.'s Opposing SMF ¶ 73.
[42] Def.'s SMF ¶ 75; Pl.'s Opposing SMF ¶ 75.
[43] Def.'s SMF ¶ 76; Pl.'s Opposing SMF ¶ 76. The Bank argues that this reimbursement was allowed under the deposit agreement governing Donovan's accounts. Donovan disagrees. I conclude, *infra*, that the Bank was entitled to debit the amount of the fraudulent item from Donovan's accounts.

In January 2007, Donovan challenged the accuracy of the Bank's "suspected fraud activity" report to ChexSystems.[44]  ChexSystems sent the Bank a request for verification.[45]  Eventually, the Bank informed ChexSystems that it had "reaffirmed" the information.[46]  "Suspected fraud activity" remained in Donovan's ChexSystems report until May 29, 2007 when the Bank removed the information from the report.[47]

**(B) Disputed facts**

Donovan adds several additional facts to the mix, which I take as true for the purposes of deciding the Bank's motions for summary judgment.  (They do not affect Donovan's motion for summary judgment.)  Donovan maintains that he was duped by various "crooks" and that he acted in good faith at all times.[48]  He says that he was working with a Bank investigator in Bangor, Maine to "catch the perpetrator who mailed the checks to him."[49]  He also claims that he did not mail the $198,200 mail-in deposit and did not know who did.[50]

---

[44] Def.'s SMF ¶ 82; Pl.'s Opposing SMF ¶ 82.

[45] Def.'s SMF ¶ 84; Pl.'s Opposing SMF ¶ 84.

[46] Id.  Initially, the Bank failed to respond within the statutorily prescribed window, and ChexSystems removed the "suspected fraud activity" notation from Donovan's report. Subsequently, the Bank reported that it had confirmed the information and requested that ChexSystems reinsert it.  Pl.'s SAMF ¶¶ 118-119; Def.'s Reply to Pl.'s SAMF ¶¶ 118-119.

[47] Pl.'s SAMF ¶ 168; Def.'s Reply to Pl.'s SAMF ¶ 168.

[48] See e.g., Pl.'s SAMF ¶ 22 ("Donovan was first victimized via the [I]nternet in August 2005 when a person claiming to be an interested buyer of Donovan's unique wood products contacted Donovan.").  He says that he was further taken advantage of by a person who offered to sell him exotic wood for his furniture business.  Although he wired this person two payments (one for $5,000 and a second for $7,000), he never received any wood and was unable to recover the funds. Pl.'s Opposing SMF ¶ 45.

[49] Pl.'s SAMF ¶ 32.

[50] Pl.'s SAMF ¶¶ 59, 64.

## II. ANALYSIS

I deal first with Donovan's Uniform Commercial Code ("UCC") claim, second with his state common law claims, third with his Fair Credit Reporting Act claims, and finally with the Bank's counterclaim.

### (A) Claim of UCC Violations—Count 1

Donovan claims that the payment on the altered Maytag check deposited to his account became "final" under the UCC.  According to the UCC:

> If a collecting bank [here Bank of America] receives a settlement for an item which is or becomes final, the bank is accountable to its customer for the amount of the item and any provisional credit given for the item in an account with its customer becomes final.

11 M.R.S.A. § 4-213(3).   Donovan claims that he is entitled therefore to the $789,613 Maytag check proceeds regardless of the fact that he was never the intended payee of the check ("the funds . . . became his property").[51]  He is wrong. The deposit agreement that Donovan signed with Bank of America provided:

> [I]f an item deposited in your account has been paid by the financial institution on which it is drawn and that institution later returns the item to us claiming that it was altered, forged or unauthorized or should not have been paid for any other reason, we may debit your account for the amount of the item.

Deposit Agreement and Disclosures, Effective October 1, 2004 at 47 (Ex. A to Donovan Aff. of May 16, 2008 (Docket Item 38-3)).[52]   Thus, even though the

---

[51] Pl.'s Compl. ¶ 53 (Docket Item 1).

[52] I have quoted from the Bank of America deposit agreement effective October 1, 2004.  The Bank argues that the June 17, 2005 deposit agreement controls, and that Donovan's May 16, 2008 affidavit, in which he asserts that he never received the June 2005 version of the deposit agreement and instead received the October 2004 version, contradicts his earlier deposition *(continued on next page)*

payment was "final" under UCC Article 4 for bank collection purposes, Bank of America retained the right to subtract the amount from Donovan's accounts once it learned that the Maytag check was altered, as it did.[53]  The UCC explicitly allows such private contractual modifications:  "The effect of the provisions of this Article [4] may be varied by agreement . . . ."[54]  11 M.R.S.A. § 4-103(1).[55]  The UCC Official Comment states that this subsection "confers blanket power to vary all provisions of the Article by agreements of the ordinary kind[,]" and that the agreement "may be with respect to . . . all items handled for a particular customer, *e.g., a general agreement between the depositary bank and the customer at the time*

---

testimony.  It is true that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).  I use the October 2004 version because the operative language is the same in both versions of the agreement, and because Donovan did not give a clear answer when asked during the deposition whether he received the June 2005 version of the deposit agreement.  Instead, he expressed uncertainty about which version he received from Bank of America, see Deposition of John Donovan, 89:6-92:10, Feb. 5, 2008 (Attachment 11 to Evidentiary Submission in Support of Def.'s SMF (Docket Item 23-53)), and his subsequent affidavit does not clearly contradict his testimony.

[53] Donovan argues that the check was never "charged back" and that in fact Bank of America issued a cashier's check for that amount.  But it is undisputed that the amount was debited from Donovan's accounts when they were closed.  See Pl.'s SAMF ¶ 98; Def.'s Reply to Pl.'s SAMF ¶ 98.  "Issue," under the UCC, requires delivery, 11 M.R.S.A. § 3-1105(1), and the cashier's check was never delivered to Donovan.  Pl.'s SAMF ¶ 137; Def.'s Reply to Pl.'s SAMF ¶ 137.

[54] The provision goes on to say: "but the parties to the agreement can not disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure."  11 M.R.S.A. § 4-103(1).  All that Donovan has to say on this point is:  "[S]ection 4-212 clearly implicates the duty of good faith and the obligation to use ordinary care and provides for damages."  Pl.'s Opp'n to Def.'s Mot. for Summ. J. 17 (Docket Item 36) (emphasis original).  That is insufficient to preserve a claim.  Section 4-212 gives Donovan no claim for the reasons I explain later in text.  See also Chase v. Morgan Guarantee Trust Co., 590 F. Supp. 1137, 1139 (S.D.N.Y. 1984) (Under UCC § 4-212(4), a bank is liable for a charge-back only if it was "negligent 'with respect to the item,'" *i.e.*, negligence has caused the dishonor that requires the charge-back, as distinguished from negligent communications to customers).  Thus, there is no reason to conclude that enforcing the contractual modification would enable the Bank to avoid liability improperly.

Similarly, Regulation CC authorizes private contractual modifications to the provisions of the regulation that govern timing of and liability for returned checks, subject to the same limitations for lack of good faith and failure to exercise ordinary care.  12 C.F.R. 229.37.

*a deposit account is opened.*" (emphasis added).[56]   Thus, the Maryland Court of Appeals has enforced a disclaimer in a bank deposit agreement that stated:

> [W]e also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem which in our judgment justifies reversal of credit.

Lema v. Bank of America, N.A., 826 A.2d 504, 505 (Md. 2003).  Commentators characterize this disclaimer as an example of "a permissible variation by agreement of the liability of the bank under section 4-214," and "not a disclaimer of the bank's obligations to act in good faith and exercise ordinary care."  Paul S. Turner, Contracting Out of the UCC: Variation By Agreement Under Articles 3, 4, and 4A, 40 Loy. L.A. L. Rev. 443, 460 (2006-2007); 1 Barkley Clark & Barbara Clark, The Law of Bank Deposits, Collections and Credit Cards ¶ 5.08[5], at 5-162 to 5-164 (rev. ed. 2008) (approving the Lema decision).  Likewise, I conclude that the Bank of America deposit contract provision here is enforceable.[57]   But see Sarah E. Brull, Recent Decisions: The Court of Appeals of Maryland, 63 Md. L. Rev. 813 (2004) (arguing that the Lema court misinterpreted the UCC).

---

[55] Similarly, § 4-212(5) provides: "A failure to charge back or claim refund does not affect other rights of the bank against the customer . . . ."

[56] Because such an agreement clearly is contemplated by the UCC, I reject Donovan's argument that it is unenforceable as a contract of adhesion. Moreover, Donovan has shown no overreaching in having such a provision.  See Schroeder v. Rynel, Ltd., 720 A.2d 1164, 1167 (Me. 1998).

[57] I therefore do not address the Bank's alternative restitution/unjust enrichment claims.  See, e.g., Great Western Bank & Trust v. Nahat, 674 P.2d 323 (Ariz. Ct. App. 1983); Greer v. White Oak State Bank, 673 S.W.2d 326 (Tex. App. 1984); James J. White & Robert S. Summers, Uniform Commercial Code, § 20-3 (5th ed. 2008).

Donovan also asserts that UCC § 4-212(1) gives him relief because it states that if a bank has made a provisional settlement with a customer on an item and later fails to receive final settlement for the item, and the required "return [of the item] or notice [of the facts] is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit or obtain refund from its customer, but *it is liable for any loss resulting from the delay*." 11 M.R.S.A. § 4-212(1) (emphasis added). Here, Donovan claims that the Bank never notified him of the facts or returned the Maytag check.[58] But Donovan has shown no loss to him resulting from the delay, for he has shown no right to the funds in the first place. Contrary to Donovan's argument, there is nothing inequitable to the conclusion that he does not get the proceeds of the wrongfully altered Maytag check that was never intended to be payable to him.

The Bank is entitled to judgment on Count 1.

### (B)  Common Law Claims

#### Count 2:  Negligence

Donovan raises several negligence claims. To the extent that they relate to the Bank's handling of the checks, the claims are displaced by the UCC. 11 M.R.S.A. § 4-103(5); <u>Valley Bank of Ronan v. Hughes</u>, 147 P.3d 185, 191 (Mont. 2006) ("[T]o the extent that Hughes' common law claims relate to Valley Bank's processing of the checks, they are preempted by the UCC."); 1 Clark & Clark,

---

[58] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 15; Pl.'s SAMF ¶ 124. The Bank gave Donovan a copy of the Maytag check in May 2007. Pl.'s SAMF ¶ 123.

¶ 1.02[2], at 1-16 ("Because these rules 'displace' common-law notions of negligence, conversion and 'account stated,' it would be improper for a court to invoke these theories in a common-law form to reallocate fraud loss.").[59]  To the extent that Donovan's negligence claims relate to alleged misrepresentations by the Bank, I deal with them separately under his misrepresentation count.  To the extent that his negligence claims restate the Fair Credit Reporting Act claims, they may be preempted by the Act,[60] but if not, I conclude *infra* that the Bank had a reasonable basis to suspect Donovan of fraud activity and thus to maintain its reporting to ChexSystems.  Therefore, his assertions would not support a common law negligence claim.  Finally, to the extent that Donovan alleges that the Bank negligently allowed his "personal financial information to become available to perpetrators of fraud," the record reveals no evidence to support the claim.[61]

The Bank is entitled to judgment on Count 2.

---

[59] If the negligent handling claim were brought under the UCC, the Bank's liability for damages would be limited to "the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care." 11 M.R.S.A. § 4-103(5). Here, that would be zero because with the exercise of ordinary care Donovan could never have realized any amount on the wrongfully altered Maytag check or on the counterfeit mail-in deposit.

[60] See *infra* note 74.

[61] The Bank's statement of material facts asserts that there is no evidence that the Bank gave out Donovan's account number.  Def.'s SMF ¶ 61.  Donovan does not respond directly to this assertion, see Pl.'s Opposing SMF ¶ 61, but the preceding response statement says: "[S]omeone likely accessed the number through the Bank since Donovan did not give it to anyone or it was an internal Bank fraud."  Id. ¶ 60 (emphasis in original).  Neither of these statements contradicts the Bank's statement.  Donovan cites deposition testimony of a bank investigator explaining that sometimes fraud perpetrators obtain others' legitimate bank account numbers, but he does not point to any evidence in the summary judgment record that suggests this happened here.  Donovan has not identified any evidence that could lead a jury to conclude that the Bank's negligence resulted in improper access to his account information.

13

### Count 3:  Tortious Interference with Chattels

Donovan argues that this claim has nothing to do with the Bank's handling of the check; "rather, it is the <u>'funds'</u> which were in his account collecting interest."[62]  But I have concluded under Count 1 that the deposit agreement was enforceable. Thus, even if the claim is not displaced by 11 M.R.S.A. § 4-103(5), the Bank was entitled to debit his account under the deposit agreement, and there was therefore no tortious interference.

The Bank is entitled to judgment on Count 3.

### Counts 4-5:  Intentional, Reckless, and Negligent Infliction of Emotional Distress

Donovan cannot show the requisite injury for these emotional distress claims: emotional distress "so severe that no reasonable [person] could be expected to endure it." <u>Champagne v. Mid-Maine Medical Center</u>, 711 A.2d 842, 847 (Me. 1998) (quoting <u>Loe v. Town of Thomaston</u>, 600 A.2d 1090, 1093 (Me. 1991)) (intentional); <u>id</u>. at 846 n. 5 (quoting <u>Gayer v. Bath Iron Works Corp.</u>, 687 A.2d 617, 622 (Me. 1996)) ("a reasonable person normally constituted, would be unable to adequately cope with the mental stress") (negligent).  Donovan may have been disappointed that these counterfeit, altered, or unexpected checks ultimately did not yield him their face amounts and that as a result his accounts were overdrawn and closed and his credit was impaired, but that is insufficient; he did not even seek medical treatment until late January of 2008, well after this case

---

[62] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 20 (emphasis in original).

was filed and just before his deposition.[63]   Cf. Vicnire v. Ford Motor Credit Co., 401 A.2d 148, 155 (Me. 1979).

The Bank is entitled to judgment on Counts 4-5.

**Count 6:  Misrepresentation**[64]

It is difficult to understand this claim.  Donovan says that the Bank's false statement was "that the Maytag check had been honored and that the Bank had issued him a cashier's check for $779,367.77."[65]  As I have said above,[66] there can be no issuance without delivery, and it is undisputed that the Bank never delivered the cashier's check to Donovan.  In any event, the sequence of events was as follows (according to Donovan, as derived from his legal memorandum in opposition to the Bank's motion for summary judgment):

---

[63] Def.'s SMF ¶ 92.  Donovan is a Vietnam veteran who suffers from post-traumatic stress disorder ("PTSD").  Def.'s SMF ¶¶ 1, 3; Pl.'s Opposing SMF ¶¶ 1, 3.  He has had trouble keeping a steady job because of his PTSD and has not been employed since 1994.  Pl.'s SAMF ¶ 2.  Donovan denies the Bank's assertion that he sought medical treatment *only* to relieve anxiety relating to his deposition.  See Pl.'s Opposing SMF ¶ 92.  Instead, he asserts that "the fact of learning the Bank had been lying to him about producing the check" caused him to seek treatment.  Id.  At his deposition, Donovan testified that "knowing that [he] had this [deposition] date . . . has exacerbated [his] condition with PTSD" so he sought treatment from a Veteran's Administration psychiatrist.  He also said that he "didn't seek any medical intervention until recently because [he] was under the assumption that [he] was receiving a cashier's check from Bank of America and [he] had no cause.  [He] felt [he] was going to be satisfied."  Dep. of John Donovan, 14:1-15:9.  But according to his statement of additional material facts, he learned in May 2007 "that Bank of America was *not* going to honor the [Maytag] check or give him the promised cashier's check and that there was no check coming to [him]."  Pl.'s SAMF ¶ 137 (emphasis in original).  He did not see the VA psychiatrist until January 29, 2008, about seven months after he learned that he would not receive a check from the Bank.  I cannot see how this deposition testimony supports the assertion in the opposing statement of material facts that "the fact of learning the Bank had been lying to him about producing the check" caused the need for medical treatment.

[64] Valley Bank says that a misrepresentation claim is not displaced by the UCC.  147 P.3d at 191-2.

[65] Pl.'s Compl. ¶ 84.  His negligence count includes a nearly identical claim:  "The Defendant breached its duties by . . . . informing the Plaintiff that the Maytag check was 'good' and that the proceeds would be or had been sent to him . . . ."  Pl.'s Compl. ¶ 68.

[66] See supra note 53.

September 6, 2005, Donovan deposits the Maytag check and is told he cannot draw upon the proceeds for one week.

September 13, Donovan calls the branch and is told the amount is available in his account. He immediately and successfully withdraws cash at a Bank of America branch and cashes checks to himself and his daughter.

September 17, Donovan learns that a hold has been put on the proceeds of the Maytag check until September 21 and that all his accounts are being closed.  The letter informing him of the account closures also states: "A Cashier's check for any collected balance, less a $60 account research fee, will be mailed to you after all previously deposited items have been verified."

September 28 and October 3, checks that Donovan writes against the proceeds of the Maytag check are dishonored.

A monthly statement (September 24, 2005-October 24, 2005) shows the proceeds still in his account earning interest, which was credited to Donovan.

November 22, 2005, Donovan's monthly statement shows that all his accounts are at zero. It also shows that the funds from the three accounts were combined into a single cashier's check in the amount of $779,367.77. Donovan never receives this cashier's check.[67]

December 2005, a Bank employee tells Donovan that a cashier's check is in the mail to him.

January 10, 2006, persuaded that the Maytag check was altered, Bank of America refunds the check proceeds to Harris Bank, the drawee bank, but does not tell Donovan.

Sometime in January 2006, a Bank employee tells Donovan that the cashier's check may have been lost in the mail and he would have to wait ninety days before the Bank could reissue it.

Donovan receives a 2005 IRS form 1099 from Bank of America, reflecting $2,377.03 interest accrued during 2005 in his money market account, the account into which he had deposited the Maytag check.

---

[67] Donovan's memorandum says: "[I]t appeared [the check] was being issued to Donovan."  Pl.'s Opp'n to Def.'s Mot. for Summ. J. 9.  But delivery is a prerequisite to "issuance" under the UCC. 11 M.R.S.A. § 3-1105(1).

June 7, 2006, a Bank investigator tells Donovan's lawyer that Donovan was involved in a "Nigerian scam." Donovan also learns that the Bank says that he owes the Bank money.

April 2007, an employee of the Bank's RISC department tells Donovan that she has the cashier's check in front of her and that she is awaiting "verification" from Donovan.

May 2007 Donovan first learns that the Maytag check was altered.[68]

Whatever misstatements Bank personnel may have made during this chronology (and I take Donovan's version as true for purposes of these motions), Donovan has presented no evidence that he justifiably relied to his detriment on any false statements, a requirement of the misrepresentation claim.  Larson v. Johnson, 184 F. Supp. 2d 26, 35 (D. Me. 2002) (citing Barnes v. Zappia, 658 A.2d 1086, 1089 (Me. 1995) (fraudulent) and Binette v. Dyer Library Ass'n, 688 A.2d 898, 903 (Me. 1996) (negligent)).  Donovan's total response to the Bank's argument that he can show no justifiable reliance is:

> A jury could find that as a result of the false statements and deceit, the Defendant obtained possession of Plaintiff's funds, and kept them long beyond the time they were entitled to do so, and they misled Plaintiff so that his financial affairs were extremely disrupted such that he was confused as to what funds he would have available in the future for his creditors. There is plenty of evidence from which a jury could conclude that the Bank's repeated statements and misleading actions could justifiably be relied upon in this way.[69]

Passing the remarkable description of the proceeds of the wrongfully altered Maytag check as the "Plaintiff's funds," I conclude that those vague assertions do

---

[68] Pl.'s Opp'n to Def.'s Mot for Summ. J. 4-11.

not demonstrate justifiable reliance on Bank misrepresentations.  The paragraph includes no citations to the summary judgment record.  Donovan's additional statements of material fact allege only that "[t]he promises that the Funds were forthcoming in a cashier's check and other wrongs by the Defendant led to severe financial problems in Donovan's life and eventually to a foreclosure on his home and the repossession of his automobile."[70]  These conclusory assertions do not establish an injury resulting from Donovan's justifiable reliance on the Bank's alleged misrepresentations about the proceeds from the Maytag check.

The Bank is entitled to judgment on Count 6.

### Count 7:  Conversion

Donovan describes this claim as involving "the sums deposited into his accounts" and asserts that "[h]e had the right to possession and control of his accounts and the balances therein."[71]  The claim fails for the same reason as the claim for tortious interference with chattels.

The Bank is entitled to judgment on Count 7.

### Count 8:  Punitive Damages

This claim disappears with all the other state law claims.

The Bank is entitled to judgment on Count 8.

---

[69] Id. at 22.

[70] Pl.'s SAMF ¶ 154.  This statement of fact cites paragraph 39 of Donovan's affidavit, which makes the same assertion and adds: "Defendant caused repeated bouncing of checks to my mortgage lender and attendant fees charged to me by Bank of America.  Defendant's conduct caused me severe emotional distress."

[71] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 22.

### Count 9:  Breach of Fiduciary Duty

Donovan has shown no basis for a fiduciary relationship.  He entered into a commercial relationship with a bank as a depositor, just like millions of other people.  He has not shown that "the Bank undertook a special and fiduciary relationship with [him] after closing his accounts and holding his monies."[72]

The Bank is entitled to judgment on Count 9.

### Count 11:  Wrongful Dishonor

Donovan devotes only the following two sentences to this claim in his legal memorandum:  "See displacement argument above.  The UCC does not displace such actions."[73]

To the contrary, this claim is displaced by 11 M.R.S.A. § 4-103(5).

The Bank is entitled to judgment on Count 11.

### Count 12:  Defamation

This count involves the Bank's actions in reporting Donovan to ChexSystems.  The Fair Credit Reporting Act explicitly preempts defamation claims unless the plaintiff proves "malice or willful intent to injure."  15 U.S.C. § 1681h(e); Young v. Equifax Credit Info. Servs., Inc., 294 F.3d 631, 638 (5th Cir. 2002).  Donovan has presented evidence of neither, and there is no basis here for implying malice, even assuming that the Act contemplates implied malice.[74]

---

[72] Id. at 23.

[73] Id.

[74] There is also an argument for complete preemption under 15 U.S.C. § 1681t(b)(1)(F), which states: "No requirement or prohibition may be imposed under the laws of any State—(1) with respect to any subject matter regulated under- . . . (F) section 1681s-2 of this title relating to the responsibilities of persons who furnish information to consumer reporting agencies . . . ."  See Woods v. Protection One Alarm Monitoring, Inc., No. 1:06-CV-00398-SMF, 2007 WL 2391075 (E.D. (continued on next page)

The Bank is entitled to judgment on Count 12.

### Count 13:  Tortious Interference with Expectancy

Donovan's legal memorandum does not develop this claim except to say:

> The jury could also find that the Bank interfered with an economic expectancy - including an expectancy of the funds after they cleared and an expectancy of credit availability and the ability to open bank accounts, cash checks and conduct business activities. A jury could find that interference was carried out intentionally and through fraud or intimidation and caused substantial damage to the Plaintiff.[75]

But Donovan had no legitimate expectancy in the funds from the fraudulent checks.  Furthermore, he has presented no evidence of fraud or intimidation.  See McGeechan v. Sherwood, 760 A.2d 1068, 1081 (Me. 2000) ("In order to demonstrate tortious interference with an economic relationship, the claimant must show either intimidation or fraud.").

The Bank is entitled to judgment on Count 13.

### (C)  FCRA Claim—Count 10

Donovan's complaint asserts two causes of action under the Fair Credit Reporting Act ("FCRA").

### Section 1681s-2(a)

First, he alleges that Bank of America failed to comply with 15 U.S.C. § 1681s-2(a) because it furnished information to a consumer reporting agency[76]

---

Cal. Aug. 22, 2007), for a discussion of the varying interpretations of this provision.  The First Circuit has not addressed the issue of its application.

[75] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 23.

[76] Donovan's complaint alleges that the Bank furnished information to at least two entities: ChexSystems and Primary Payment Systems, Inc.  Pl.'s Compl. ¶ 108.  He later admits that there is no evidence that the Bank ever reported him to Primary Payment Systems, Inc.  Def.'s SMF ¶ 90; *(continued on next page)*

that it had reasonable cause to believe was inaccurate.[77]  But there is no private cause of action under § 1681s-2(a).  Sections 1681s-2(c) and (d) explicitly provide that only federal and state officials have authority to enforce subsection (a).  The cases agree.  <u>See</u> <u>e.g.</u>, <u>Nelson v. Chase Manhattan Mortgage Corp.</u>, 282 F.3d 1057, 1059 (9th Cir. 2002); <u>Brown v. Maine Medical Center</u>, No. 98-444-P-C, 1999 WL 33117137, at *3 (D. Me. March 18, 1999) (Recommended Decision affirmed by Docket Order of April 26, 1999).

### *Section 1681s-2(b)*

Second, Donovan raises a claim under § 1681s-2(b), which imposes certain obligations on furnishers of credit information ("furnishers"), such as the Bank, when they receive notice from a consumer reporting agency ("CRA") that a consumer has disputed the accuracy or completeness of an item of information that the furnisher provided to the CRA.  The Bank received such a notice from ChexSystems in early 2007.[78]  After receiving notice of a dispute from a CRA, the furnisher (here, the Bank) is required to "conduct an investigation with respect to the disputed information."   15 U.S.C. § 1681s-2(b)(1)(A).   If the investigation reveals that the disputed information is incomplete or inaccurate, the furnisher (the Bank) must report that result to all consumer reporting agencies to which the

---

Pl.'s Opposing SMF ¶ 90.

[77] Pl.'s Compl. ¶ 109.

[78] <u>See</u> Def.'s SMF ¶ 84.  The record is unclear about precisely when Bank of America received the notice of dispute.  ChexSystems mailed a notice to the Bank on January 17, 2007, but the Bank says that it never received this letter.  <u>See</u> Def.'s Statement of Additional Facts ¶ 3 (Docket Item 44).  Donovan denies the Bank's claim, but his citation establishes only that ChexSystems mailed the January 17 letter, not that the Bank received it.  Pl.'s Reply to Def.'s Statement of Additional Facts ¶ 3 (Docket Item 48).  In any event, the Bank finally responded to ChexSystems' request for investigation on March 8, 2007.  Ghidella Decl. ¶ 7 (Attachment 9 to *(continued on next page)*

information was furnished.  15 U.S.C. § 1681s-2(b)(1)(D).  And, if the disputed information is found to be "inaccurate or incomplete or cannot be verified, . . . for purposes of reporting to a consumer reporting agency only," the furnisher (the Bank) must modify, delete, or block the reporting of the information, as appropriate.  15 U.S.C. § 1681s-2(b)(1)(E).  Donovan maintains that the Bank did not conduct the required investigation after receiving the notice of dispute from ChexSystems.[79]  The Bank denies this assertion.[80]

The First Circuit has not addressed whether a private cause of action is available under this section, but the weight of authority supports the argument that such a right exists.  See e.g., Nelson, 282 F.3d at 1059-60; Bach v. First Union Nat'l Bank, 149 Fed. App'x. 354, 358-59 (6th Cir. 2005) (unpublished); Brown, 1999 WL 33117137, at *3; Akalwadi v. Risk Mgmt. Alternatives, Inc., 336 F. Supp. 2d 492, 509 (D. Md. 2004) (listing cases).  But see Carney v. Experian Info. Solutions, Inc., 57 F. Supp. 2d 496, 502 (W.D. Tenn. 1999) (holding that a consumer may not bring a claim under § 1681s-2(b)).  Therefore, I assume that Donovan has a private cause of action against the Bank.

I assume that there is a factual dispute about what steps the Bank took to reinvestigate its initial report.[81]  Nevertheless, Donovan's claim fails as a matter of law because he has not identified any information that a reasonable

---

Evidentiary Submission in Support of Def.'s SMF (Docket Item 23-51)).

[79] Pl.'s SAMF ¶ 165.

[80] Def.'s Reply to Pl.'s SAMF ¶ 165.

[81] Only in its reply brief does the Bank argue that it conducted a reasonable investigation. Typically, I would not consider arguments raised for the first time in reply, but here, because Donovan responded to the argument in his motion for summary judgment, there is no prejudice. *(continued on next page)*

investigation[82] would have uncovered, and that would have cast doubt on the Bank's initial report of suspected fraud activity or caused it to revise its conclusion.  If a reasonable investigation would not have changed the outcome, Donovan cannot show that he has been harmed by any alleged flaws in the Bank's investigation.  See Gorman v. Wolpoff & Abramson, LLP, 435 F. Supp. 2d 1004, 1009 (N.D. Cal. 2006) (granting summary judgment for the defendant in part because the plaintiff failed to identify relevant information that further investigation would have revealed).  Cf. Cushman v. Trans Union, 115 F.3d 220, 226 (3d Cir. 1997) (quoting approvingly the district court's summation, in a § 1681i(a) case against a CRA, that "the decisive inquiry is whether [the CRA] could have determined that the [plaintiffs allegation was correct] if it had reasonably investigated the matter"); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) ("[A § 1681i(a)] claim is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry." (emphasis in original)); Benson v. Trans Union, LLC, 387 F. Supp. 2d 834, 843-44 (N.D. Ill. 2005) (holding that the CRA's

---

Nevertheless, the matter remains a disputed issue that I construe in Donovan's favor.

[82] Section 1681s-2(b) does not define the level of investigation that furnishers are required to conduct.  At least one circuit court and several district courts have applied a reasonable investigation standard.  See Johnson v. MBNA America Bank, N.A., 357 F.3d 426, 431 (4th Cir. 2004) ("[Section] 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."); id. at 430 n.2 (listing district court cases).  The parties here seem to assume that this is the proper standard.  See Def.'s Reply to Pl.'s Opp'n. to Def.'s Mot. for Summ. J. 9 n.8 ("[T]he reinvestigation was reasonable.") (Docket Item 52); Pl.'s Opp'n to Def.'s Mot. for Summ. J. 28 ("The reasonableness of the furnisher's actions are . . . fact questions for the jury . . . .").

investigation was reasonable as a matter of law because the plaintiff failed to identify information that a more extensive investigation would have revealed to provide a more accurate report).[83]

I start with what the Bank knew when it first reported "suspected fraud activity" to ChexSystems in October 2005 (an action not subject to a private lawsuit under the FCRA).  At the time the Bank submitted the initial report on October 27, 2005, it had confirmed that the Maytag check Donovan deposited into his money market account had been altered, and that the mail-in deposit to Donovan's interest savings account was counterfeit.  The Bank had learned previously that two other deposits into Donovan's regular checking account were dishonored as fraudulent: first the $59,110 check was returned as counterfeit; second, the $ 98,000 check was returned as altered.  The Bank also possessed the $88,000 check, which Donovan never deposited.  Donovan had made several withdrawals from his regular checking account after depositing these two checks, resulting in overdrafts in his regular checking account.[84]  Before the Bank first reported "suspected fraud activity" to ChexSystems, it also knew that Donovan

---

[83] Several courts evaluating § 1681s-2(b)'s reinvestigation requirement have concluded that § 1681i(a), imposing similar obligations on CRAs, is analogous.  See e.g., Johnson, 357 F.3d at 431; Akalwadi, 336 F. Supp. 2d at 510; Bruce v. First U.S.A. Bank Nat'l Ass'n, 103 F. Supp. 2d 1135, 1143 (E.D. Mo. 2000).

[84] In its statement of material facts, the Bank states that Donovan is a gambler and that in 2005, he had net gambling losses of $38,000.  Def.'s SMF ¶¶ 7-8.  Donovan admits these assertions, Pl.'s Opposing SMF ¶¶ 7-8, and adds that he spent a portion of the proceeds of the Maytag check on gambling.  Pl.'s SAMF ¶ 6.  However, the Bank does not claim that it knew this information at the time it reported Donovan to ChexSystems or that it discovered the information in its reinvestigation.  Given my resolution of Donovan's FCRA claim, I conclude that the gambling facts are not material.

professed innocence with respect to any fraud, and ignorance of the source of the $198,200 mail-in deposit.[85]

To sustain its report in the face of Donovan's January 2007 dispute, the Bank needed a reasonable basis for suspecting fraud activity, even after completing the § 1681s-2(b) investigation.[86]  The Bank argues that based on the fraudulent deposits and Donovan's conduct with respect to those deposits, it "had every reason to suspect [Donovan] of engaging in improper activities."[87]  Donovan disagrees, arguing that the Bank "had no reasonable cause to believe that Donovan was involved in fraud"[88] and that a "reasonable and careful investigation of Bank of America's records would have led to the conclusion that the fraud

---

[85] Pl.'s SAMF ¶ 90.  The Bank admits only that Donovan claimed that he did not mail in the $198,200 check.  Def.'s Reply to Pl.'s SAMF ¶ 90.  But the facts the Bank cites do not contradict Donovan's assertion that he informed Bank employees that he was not involved in any fraud.

[86] Although Donovan has not argued the point, I have considered whether to read the report "suspected fraud activity" as really conveying the message "this consumer engaged in fraud activity."  Under that reading, a furnisher engaged in a § 1681s-2(b)(1) investigation would have to delete the information unless it could verify that the consumer actually engaged in fraud.  But to require 100% certainty that a consumer was responsible for fraudulent activity conducted in his accounts would undermine the goals of the Act by preventing furnishers who reasonably suspect fraud activity from sharing relevant information.  Congress passed the FCRA in 1970 after finding that "[t]he banking system is dependent upon fair and accurate credit reporting.  15 U.S.C. § 1681(a).  Congress sought to enhance the function of the credit reporting industry, and it required CRAs to "meet[] the needs of commerce . . . in a manner which is fair and equitable to the consumer . . . ."  15 U.S.C. § 1681(b); Cahlin, 936 F.2d at 1158.  This does not mean that CRAs may "report only that information which is favorable or beneficial to the consumer."  Cahlin, 936 F.2d at 1158.  Rather, the law promotes the "interests of both consumers and potential creditors in fair and accurate credit reporting."  Id.  Congress amended the FCRA in 1996 to "impose[] a duty upon furnishers of credit information to report accurate information to consumer reporting agencies regarding a consumer's credit."  Bach, 149 Fed. App'x at 358 (unpublished).  See 15 U.S.C. § 1681-2.  In a case such as this, where it is uncontested that fraud occurred, and the only genuine dispute is whether the consumer participated in the fraud, a rule that required the Bank to determine with complete certainty that Donovan was a willing participant would prevent the Bank from reporting the information, even if it had reasonable grounds to suspect Donovan.  That information "is clearly of interest to potential creditors and would be effectively hidden" if the Bank did not report it.  Cahlin, 936 F.2d at 1158.  Therefore, I read the report more narrowly, as reflecting the assertion that the Bank had a reasonable basis for suspecting fraud activity within Donovan's accounts.

[87] Def.'s Mot. for Summ. J. 19-20.

charges being leveled against the Plaintiff could not be verified."[89]  He also argues that the "reasonableness of the [Bank's] actions are . . . fact questions for the jury, although in this case they may be so unreasonable so as to be unreasonable as a matter of law."[90]

Section 1681s-2(a)(1) is instructive here, because it establishes the underlying standard that the Bank must satisfy when it first reports consumer credit information to CRAs.  Specifically, in prohibiting the Bank from providing consumer information to a CRA if it knows or has reasonable cause to believe that the information is inaccurate, § 1681s-2(a)(1) defines "reasonable cause to believe that the information is inaccurate" as "having specific knowledge, *other than solely allegations by the consumer*, that would cause a reasonable person to have substantial doubts about the accuracy of the information."  15 U.S.C. § 1681s-2(a)(1)(D) (emphasis added).

In fact, Donovan has presented no factual information, apart from his own testimony, that impugns the accuracy of the Bank's report.  His response to the Bank's motion for summary judgment lists various allegations[91] (many of which are disputed by the Bank but I take as true for purposes of these motions), that he says support his contention that the Bank failed to conduct a reasonable investigation of his dispute.[92]  But most of these statements have nothing to do

---

[88] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 26 n.19.
[89] Id. at 26.
[90] Id. at 28.
[91] His cross-motion for summary judgment contains a nearly identical list.  See Pl.'s Mot. for Summ. J. 9-11 (Docket Item 25).
[92] See Pl.'s Opp'n to Def.'s Mot. for Summ. J. 27.

with what the Bank knew or might have learned about whether Donovan participated in the fraud.  The only statements that are arguably relevant to this inquiry establish that Donovan continued to profess ignorance of the $198,200 mail-in deposit, asked a Bank employee whether the Maytag check "was good,"[93] and cooperated when a Bank investigator asked him to produce certain documents.  In light of the other information the Bank possessed, these consumer declarations of innocence, without more, were not enough to displace the Bank's determination that it had a reasonable basis to suspect fraud activity.  Cf. Benson, 387 F. Supp. 2d at 843 (in a § 1681i(a) case, holding that the CRA's investigation was reasonable as a matter of law, in part because the only support for the assumption that the disputed information was inaccurate was the plaintiff's own deposition testimony, which conflicted with other evidence in the record).

Finally, Donovan argues that the Bank effectively admitted that the derogatory information that it submitted to ChexSystems was inaccurate when, on May 29, 2007, it removed that information from Donovan's ChexSystems report and provided "bank error" as the reason for the change.[94]  The Bank has produced an affidavit by a Bank employee (which Donovan has not challenged) stating that she entered the "bank error" notation because it was the only way to remove the "suspected fraud activity" information from Donovan's ChexSystems report, but

---

[93] The Bank asserts that a Bank employee first told Donovan that the Maytag check "was phony," and Donovan then went to a different branch to deposit it.  Def.'s Objection to Pl.'s Mot. for Summ. J. 3 (Docket Item 43); Def.'s Statement of Additional Facts ¶ 2.  Donovan denies this allegation, Pl.'s Reply to Def.'s Statement of Additional Facts ¶ 2, and I accept his denial for purposes of these motions.

[94] See Pl.'s Opp'n to Def.'s Mot. for Summ. J. 26.

that she did not conclude that there was in fact bank error.[95] Her affidavit says that she cannot remember why she submitted the request to ChexSystems to delete the information from Donovan's report.[96]

Donovan would like me to conclude that a jury could find that the "bank error" notation is effectively an admission by the Bank that it knew all along that there was no reasonable basis to suspect Donovan of fraud activity, or that it knew that a reasonable investigation would have revealed that he was guiltless. But that is demanding too much of these two words inserted into Donovan's ChexSystems record later. I have already determined that the relevant question is whether the Bank had a reasonable basis to suspect fraud activity at the time that it confirmed its ChexSystems reporting, on March 8, 2007.[97] In the absence of any evidence addressing *why* the Bank ultimately decided to remove the ChexSystems report, the fact that it did so on May 29, 2007, does not impact my analysis of what a reasonable investigation would have yielded nearly three months earlier. Even if I take the "bank error" notation at face value and accept that the Bank concluded in May that its earlier reporting was in error, that information is relevant only if the record contains some evidence indicating that the Bank knew something on March 8 that should have provoked the correction then. Donovan has pointed to no such evidence.[98]

---

[95] Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. 5 n.5; Def.'s Response to Pl.'s SMF ¶ 13 (Docket Item 44). Donovan's reply statement does not contradict this assertion. See Pl.'s Reply to Def.'s Response SMF ¶ 13 (Docket Item 48).

[96] Decl. of Mary Jane Couture ¶ 13 (Ex. H to Def.'s Response to Pl.'s SMF (Docket Item 44-9)).

[97] See Ghidella Decl. ¶ 7.

[98] Donovan also notes in his statement of additional material facts that the Bank initially reported
*(continued on next page)*

The Bank is entitled to judgment on Count 10.

**(D)  *The Bank's Counterclaim***

The Bank argues that it is entitled to summary judgment on its counterclaim against Donovan.  The Bank says that Donovan's accounts were overdrawn by $10,246.07 after the Bank repaid Harris Bank.[99]  It seeks repayment from Donovan, pursuant to the terms of the deposit agreement.

Donovan does not dispute the amount of the overdraft.  He argues that the Bank was not entitled to remove funds from his accounts to repay Harris Bank.[100] His only support for this argument is: "The dealer agreement was not given to Donovan."[101]  Presumably, this statement refers to the June 2005 deposit agreement, which the Bank says governs.  Donovan denies that he ever received that document and claims that he received only the October 2004 deposit agreement.[102]  Under either version of the agreement, however, Donovan is liable to the Bank for repayment.  The 2004 version states:  "If you have insufficient

---

all three of Donovan's Bank of America accounts as closed because of suspected fraud activity. Pl.'s SAMF ¶ 108.  After he first disputed the Bank's report, ChexSystems removed the information because the Bank failed to respond within thirty days.  Soon thereafter, the Bank reported to ChexSystems that it had confirmed the information and requested that ChexSystems reinsert it into Donovan's report.  Pl.'s SAMF ¶¶ 118-119; Def.'s Reply to Pl.'s SAMF ¶¶ 118-119.  The Bank's communication with ChexSystems at this time addressed only Donovan's regular checking account.  Pl.'s SAMF ¶ 120; Def.'s Reply to Pl.'s SAMF ¶ 120.  Donovan does not make any particular argument based on these facts, and I cannot see how this series of events helps his FCRA claim.  The impact on Donovan is the same, whether his ChexSystems report indicates that the Bank reported the closure of three accounts or one account because of suspected fraud activity.

[99] Def.'s Mot. for Summ. J. 29.

[100] Pl.'s Opp'n to Def.'s Mot. for Summ. J. 23.

[101] Id.

[102] See e.g., id. at 17; Pl.'s Opposing SMF ¶ 42.

funds to cover a returned item, we may overdraw your account.  You agree to repay us immediately."[103]

The documentation supporting the Bank's motion for summary judgment establishes, and Donovan does not deny, that the Bank repaid Harris Bank $789,613.84 and that the Bank recovered $779,367.77 from Donovan's three accounts.[104]  The difference is $10,246.07.  The Bank is entitled to recover that amount from Donovan.  The Bank's motion for summary judgment on its counterclaim is granted.

## III.  CONCLUSION

The Clerk shall enter judgment for the Bank on all of Donovan's claims and for the Bank on the counterclaim against Donovan in the amount of $10,246.07.

**SO ORDERED.**

**DATED THIS 29TH DAY OF AUGUST, 2008**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[103] Bank of America Deposit Agreement and Disclosure, Effective October 1, 2004 at 47.
[104] Def.'s SMF ¶ 76.

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CIVIL DOCKET FOR CASE #: 2:07CV168 (DBH)**

| | | |
|---|---|---|
| **John James Donovan,** | Represented By | **John S. Campbell** |
| | | Campbell & Associates PA |
| **Plaintiff** | | P.O. Box 369 |
| | | Portland, ME 04112-0369 |
| | | (207) 775-2330 |
| | | email: |
| | | campbellassoc@maine.rr.com |

**v.**

| | | |
|---|---|---|
| **Bank of America, NA,** | Represented By | **Rufus E. Brown** |
| | | Brown & Burke |
| **Defendant** | | P.O. Box 7530 |
| | | Portland, ME 04101 |
| | | (2070 775-0265 |
| | | email: |
| | | rbrown@brownburkelaw.com |